2235

T.W. MORTON BUILDERS INC., Plaintiff v. Richard P. von BUEDIN-GEN, Individually, and C. Clifton Alsbrooks, as the Personal Representative of the Estate of Bari L. von Buedingen, and NCNB National Bank of South Carolina, f/k/a NCNB South Carolina, Defendants. WILLIAMS-BURG FENCE COMPANY, Plaintiff,Richard P. von BUEDINGEN, a/k/a Richard P. von Buedingen Philippsiech, Individually, and C. Clifton Alsbrooks, as the Personal Representative of the Estate of Bari L. von Buedingen, a/k/a Bari L. von Buedingen Philippseich, and NCNB National Bank of South Carolina, f/k/a NCNB South Carolina, Defendants. Herbert A. JONES, Plaintiff v. Richard P. von BUEDINGEN, a/k/a Richard P. von Buedingen Philippseich, Individually, and C. Clifton Alsbrooks, as the Personal Representative of the Estate of Bari L. von Buedingen, a/k/a Bari L. von Buedingen Philippseich, and NCNB National Bank of South Carolina, f/k/a NCNB South Carolina, Defendants, of whom T.W. Morton Builders, Inc., is Respondent-Appellant, and Richard P. von Buedingen, Individually, and C. Clifton Alsbrooks, as the Personal Representative of the Estate of Bari L. von Buedingen, are Appellants-Respondents.

(450 S.E. (2d) 87)

Court of Appeals

*John W. Harte* and *Gregory P. Harlow,* Aiken, *for appellants-respondents.*

*Richard E. Miley,* North Augusta, *for respondent-appellant.*

Heard Feb. 8, 1994.

Decided Sept. 30, 1994.

*Per Curiam:*

T.W. Morton Builders, Inc. brought this foreclosure action pursuant to the von Buedingens' alleged failure to pay in full for renovations performed on their home. The von Buedingens counterclaimed for, among other things, breach of contract and unfair trade practices. The master held in favor of the contractor for $116,434.88. Both parties appeal. We affirm in part, reverse in part and remand.

After purchasing a $500,000 home at 1500 Huntsman Drive in Aiken, South Carolina, the von Buedingens sought bids for considerable renovations to the home, including the addition of a master bedroom/bathroom wing, a horse barn, and other significant improvements.

They received bids on the proposed renovations, including a bid from T.W. Morton for $540,000, which they rejected outright. The von Buedingens also rejected T.W. Morton's second bid of $425,000. After a meeting, however, at which the parties discussed further scaling down of the project, the von Buedingens accepted T.W. Morton's third bid of 370,690.

The contract between the parties was an American Institute of Architects form contract entitled "Standard Form of Agreement Between Owner and Contractor." The initial language of the form provides that the basis of payment is the "Cost of the Work Plus a Fee."[1] Elsewhere, the contract provides:

> The maximum cost to the Owner, including the Cost of the Work and the Contractor's Fee, is *estimated to be* the sum of *THREE HUNDRED SEVENTY THOUSAND, SIX HUNDRED NINETY AND 00/100* dollars *($370,690.00); such* Maximum Cost shall be increased or decreased for Changes in the Work as provided in Article 7. *A ten percent deposit is due upon execution of this contract in the amount of $37,069.00.*[2]

Other pertinent sections of the contract include:

### ARTICLE 9

### COSTS NOT TO BE REIMBURSED

. . . .

9.1.6 Costs due to the negligence of the Contractor, any Subcontractor, anyone directly or indirectly employed by any of them, or for whose acts any of them may be liable, including but not limited to the correction of defective or nonconforming Work, disposal of materials and equipment wrongly supplied, or making good any damage to property.

### ARTICLE 7

7.3 Any Changes in the Work which result in additional costs to the Contract will not become effective until

---

[1] T.W. Morton's cover letter for the $370,690 bid also provides that "[u]pon acceptance of proposal, a cost plus contract shall be drawn up."

[2] The underlined portions represent language typed in by the parties, while the balance is from the standard AIA form.

Change Orders are signed by the parties or their representatives, and the funds are on deposit in the construction account at NCNB.[3]

Ted Morton of T.W. Morton testified this form contract was an AIA cost plus contract form, and denied he would have ever agreed to a fixed price contract on the project.

After construction began, the contract requirement of obtaining signed change orders for each change was not observed. According to Charles Horton, the job superintendent on the project, and Ted Morton, not all changes were put into change orders because the orders would have slowed the progress of the project, particularly when the changes became so frequent. Morton testified changes were made daily, and that the number of changes ultimately made strict compliance with the contract impossible. Morton also testified that Dr. von Buedingen never complained the change order procedure was no followed, and did not insist on written change orders even once the overruns were apparent. Dr. von Buedingen furthermore did not establish a construction account as provided in the change order provision of the contract.

Ultimately, the final cost well exceeded the total of the bid plus written, authorized change orders. The final costs for the renovation project totalled approximately $654,000.

Horton testified to the various changes requested during the course of construction. He attributed a number of the changes to Wesley Cadle, the von Buedingens' interior decorator. According to Horton, Cadle insisted interior trim work be removed and then redone after the wallpapering. The trim itself was also more detailed than the plans indicated and required extra labor. Cadle also directed the installation of cabinets in Mrs. von Buedingen's bathroom, which were not in the original plans, and requested expensive flextrim on the radius and porthole windows be redone, for reasons unrelated to workmanship, at an additional cost of $2,300.

Several witnesses testified to numerous other changes made involving extra expense. The hardwood floors were refinished; extra marble work was added to the old fireplace;

[3] This provision was added by the parties, and was not included in the standard language of the form contract.

electrical work was done in the old house; doors were replaced in the old house; the front bay window was raised; and access door was moved; changes were made in the framework; a vent and certain outlets were moved; trim was reapplied to the bay windows; extra plywood was added to the sunroom floor;[4] a column in front of the house was changed; the barn doors were rebuilt; fencing was removed from the backyard; a room was added in the garage; the barn was enlarged; a well was added; and several additional tons of dirt were removed at the start of the project. Costs were also increased by the considerable delays resulting from these changes.

Costs mounted further when Dr. von Buedingen demanded the sunroom be rebuilt with a different slope to the roof. Apparently, the original plans showed sloped roofs on the bay, but were not clear as to the sunroom. Horton and the framing contractor both believed the original roof line complied with the plans. However, Dr. von Buedingen insisted on the change, and the second roof proved to be more difficult and expensive to build. The framing contractor estimated the extra framing work on the sunroom totalled $7,500. A separate subcontractor, Richard Bragg, testified the second roof was more complicated and required double the amount of copper, excluding the wasted copper torn from the first roof.

A dressage arena was added at considerable cost. Horton testified the arena was not part of the original contract. Morton likewise testified the $370,690 bid did not include the arena. Dr. von Buedingen claimed, however, the arena was always included in the plans, and gave directions to complete it.

Although the landscaping bid had been $16,000, the final bill amounted to $30,513.70. The landscaping subcontractor, Mark Solly, testified he had to provide extra sod and perform extra work not anticipated in the bid, including drain field grading for the dressage arena, drainage systems around the barn, and 500 feet of edging around the beds and house. Solly also testified Dr. von Buedingen requested changes in the cross-tie walls.

The framing contractor, Leonard Kelly, had bid $38,000, but his final bill was $54,700. Kelly provided a list of 28 requested

---

[4] The extra plywood was apparently necessary because the von Buedingens changed the sunroom flooring from hardwood to tile.

changes and additions, including the reframing of the sunroom.

The tile contractor, Boyce Raulerson, had bid $17,017, and his final bill was $35,968.92. Raulerson attributed the difference to the von Buedingens' decision to change from marble to granite, and to extra work requested in the entranceway, gazebo, tack room, laundry room, and barn area. Raulerson also put tile in the sunroom, which was not initially contemplated, and had to redo some tile work pursuant to plumbing changes.

Although costs were mounting from the numerous changes, T.W. Morton failed to properly inform the von Buedingens of the escalating costs of the project. On July 23, 1990, T.W. Morton sent the von Buedingens the third draw request indicating a contract sum of $412,000, with payments of $273,000, and a "balance to finish" of $139.390.53. Judy Morton of T.W. Morton claimed the $139,390.53 figure represented simply the difference between the contract price and payments received, and should not have been represented as the balance to finish. The error was not corrected until the sixth draw, at which point the cost of the project, as yet unfinished, had reached $527,015.90.

Despite these errors, however, there was nonetheless evidence that Dr. von Buedingen had knowledge of the cost overruns at an earlier point. Jeff Spears, vice-president with NCNB South Carolina, which financed the project, testified he first learned of potential problems with the project on July 23, 1990. Spears said he learned of these problems through discussions with Dr. von Buedingen and others regarding the cost overruns.

The parties and bank representatives met at the bank on November 22, 1990 to discuss the project and the unpaid sixth draw request of $111,252.89. Dr. von Buedingen agreed to put up additional collateral to release the sixth draw and pay in full upon completion of the job if T.W. Morton provided a list of items as yet uncompleted. T.W. Morton prepared the list and estimated the remaining cost to complete the project at $108,000.

As to workmanship, Dr. von Buedingen complained of problems with the barn plumbing, flooding in the pool house, mildew, paint peeling, and leaking where the new roof at-

tached with the main house. Morton acknowledged there were flooding problems after the renovations, but attributed them to changes demanded by Dr. von Buedingen, who directly instructed the subcontractor as to grading.

After hearing all of the evidence, the master found the von Buedingens either directed the changes that were made, or approved of the changes requested by their architect and their decorator. The master found some of the requested changes were reflected in change order forms not returned by the von Buedingens, while other changes were not reflected on any change order forms. The master found further that the dressage arena was not included in T.W. Morton's bid.

The master found the von Buedingens, their architect and their interior decorator were in almost exclusive control of the cost of most of the allowance items, which exceeded the contract allowances by $116,215.41. The master found the von Buedingens therefore were in at least as good a position, if not better, to keep track of the allowance expenditures. The master concluded further that the von Buedingens were aware or should have been aware of the cost overruns by July 23, 1990, if not sooner. The master also noted that while T.W. Morton gave an inaccurate "cost to complete" figure on the first five draw requests, the von Buedingens failed to demonstrate the actual cost figures were inaccurate.

The master determined that T.W. Morton bore no responsibility for the subsequent problems the von Buedingens experienced with flooding, or with mildew on the vaulted ceiling, because these problems resulted from changes or decisions over which T.W. Morton did not have control. The master also concluded that additional costs related to extra work on the barn doors were not attributable to T.W. Morton and that the extra expense was chargeable to the von Buedingens as part of the "cost of the work."

The master found that delays in the project were the result of the numerous changes directed by the von Buedingens, and that T.W. Morton substantially completed the project within a reasonable period of time.

The master rejected the von Buedingens' claim that T.W. Morton engaged in unfair trade practices by providing a fictitiously low bid and then raising the cost of the work. The master found the present action involved only a private breach of

contract and was insufficient to affect the public interest so as to give rise to an unfair trade practices claim. Furthermore, the master found that T.W. Morton's bid was reasonable, noting a second contractor independently gave a similar bid for the project.

The master concluded the contract between the parties was a cost plus contract, not a guaranteed maximum price contract. Alternatively, the master found that even if the original contract had been a guaranteed maximum price contract, the parties orally modified it to become a cost plus contract. Furthermore, the master found the von Buedingens consented to a modification of the contract whereby the parties would not strictly comply with the requirement of written change orders.

The master also found the von Buedingens agreed at the November, 1990 meeting to pay the sixth draw request, plus completion costs of approximately $108,000, including Morton to complete the work. The master then found T.W. Morton's final draw request of $127,259.88 was due and payable as of April 1, 1991. T.W. Morton was, however, liable for the cost of a $4,000 oversight on the plumbing estimate, and for $4,000 to correct defective exterior paint and other miscellaneous problems. The master ordered the subject property sold at public auction to satisfy the remaining net amount of $116,434.88 due T.W. Morton.

The master held further that T.W. Morton was not entitled to prejudgment interest, but that it was entitled to postjudgment interest at a rate of twelve percent. The master also concluded the litigation was inevitable as a result of poor practices by both parties, and therefore that neither should recover attorney's fees.

In a supplemental order, the master held T.W. Morton's warranty would run from the date of filing of the order. The master further issued an order dated December 28, 1992 pursuant to Rule 59(e), SCRCP motions filed by the von Buedingens and T.W. Morton. The master found T.W. Morton was not entitled to prejudgment interest because the sum due was was not certain or capable of being reduced to certainty as the negligent manner in which the parties dealt with the contract required litigation to reach a figure due under the contract. He further found the Mechanics' Liens statutes did not re-

quire that attorney's fees be awarded but only that they "may" be recovered. He thus denied T.W. Morton the recovery of attorney's fees.

## I.

On appeal, the von Buedingens argue the master erred in not giving greater weight to the "guaranteed maximum cost" language of the contract and instead finding the contract was a cost plus contract. We affirm the finding of a cost plus contract.

Foreclosure of a mechanic's lien is an action at law. *Glover v. Lewis*, 299 S.C. 44, 382 S.E.(2d) 242, 243 (Ct. App. 1989). In an action at law, tried without a jury, the master's findings of fact will not be disturbed on appeal unless found to be without evidence which reasonably supports the master's findings. *Townes Assocs., Ltd. v. City of Greenville*, 266 S.C. 81, 221 S.E. (2d) 773 (1976).

Language on the first page of the contract form provides that the basis of payment is "Cost of the Work Plus a Fee." Furthermore, T.W. Morton's cover letter to its final bid indicates a cost plus contract shall be drawn up, and Morton personally testified he would never have entered into a fixed price contract for this project. This evidence reasonably supports the master's finding of a cost plus contract.

## II.

The von Buedingens also dispute findings of liability for costs exceeding the original estimate, of liability for changes authorized in reliance on the draw requests, and of liability for deficiencies and failures in the plans, and further dispute the master's finding they waived the change order requirement of the contract. We affirm as to each of these issues.

There is evidence the excess costs were attributable to the von Buedingens. Ted Morton, and a number of others involved in the project, testified the von Buedingens requested numerous changes that resulted in additional costs. There is evidence the von Buedingens did not rely on the draw requests, and knew the project costs were escalating. A representative of the bank testified Dr. von Buedingen was aware of the escalating costs of the project no later than July, 1990. There is

evidence the von Buedingens were responsible for certain deficiencies and failures in the plans. Morton testified the von Buedingens personally directed subcontractors to raise the barn and to move a vent, and that these changes resulted in certain flooding and mildew problems. Finally, there was evidence of waiver. The von Buedingens did not establish the construction account to cover change order costs as required by the change order provision of the contract, and requested numerous changes without insisting on written change order forms.

Again, we affirm the findings of the master, which are reasonably supported by the evidence.

### III.

The von Buedingens also argue the master erred in not finding Morton's bidding practices constituted an unfair and deceptive trade practice because the alleged wrongdoing does affect the public interest.

We need not determine whether the public interest is affected by the alleged actions of T.W. Morton. The master also found no deceptive or unfair practices on the part of T.W. Morton that would support an unfair trade practices claim. The record reveals a second contractor's bid was similar to T.W. Morton's bid. This evidence is sufficient to support the master's finding of no deceptive or unfair bidding practices.

### IV.

T.W. Morton, in turn, appeals the master's determination that it was not entitled to prejudgment interest when the contract provided for the payment of interest[5] and the amount due was capable of being reduced to a certainty.

The master found poor business practices on the part of both parties. He in turn found the parties responsible for allowing the project to get out of hand, and determined that prejudgment interest was inappropriate. Implicitly, the master concluded that while the parties agreed to the changes in

---

[5] The contract provides that "Payments due and unpaid under the Contract Documents shall bear interest from the date payment is due at the rate [of 12% interest]."

the project, they did not have a stated account as to the cost overruns.

On an obligation to pay money, if the sum is certain or ■ capable of being reduced to certainty, prejudgment interest is allowed from a point when the parties agreed, or the law provides, payment was demandable. *Southern Welding Works, Inc. v. K & S Construction Co.*, 286 S.C. 158, 332 S.E. (2d) 102 (Ct. App. 1985).

T.W. Morton's success in proving the additional amount due for the renovations does not automatically translate into entitlement to prejudgment interest on the unpaid balance. *Id.* To establish its right to prejudgment interest, T.W. Morton had the burden of establishing a stated account and the parties' agreement, express or implied, that the account is a true statement due at a specific point. *Id.* The master's implicit finding of no stated account is supported by the testimony of Dr. von Buedingen, who vigorously disputed the amount due T.W. Morton for cost overruns. We accordingly affirm the denial of prejudgement interest.

## V.

T.W. Morton also argues the special master should have awarded it attorney fees under Sections 29-5-10 & -20 of the South Carolina Code because it was the prevailing party in this mechanic's lien foreclose. We agree.

The mechanics' liens statutes provide as follows as to attorney fees:

> A person whom a debt is due for labor performed or furnished or for materials furnished and actually used in the erection, alteration, or repair of a building or structure upon real estate . . . by virtue of an agreement with . . . the owner . . . shall have a lien upon the building or structure . . . to secure the payment of the debt due to him. The costs which may arise in enforcing or defending against the lien under this chapter, including a reasonable attorney's fee, may be recovered by the prevailing party. The fee must be determined by the court in which the action is brought but the fee and the court costs may not exceed the amount of the lien. . . .

S.C. Code Ann. § 29-5-20(a) (1991) (Emphasis added).

Elsewhere Section 29-5-20 of the Mechanics' Liens Statute provides:

> Every laborer, mechanic, subcontractor, or person furnishing material for the improvement of real estate when the improvement has been authorized by the owner has been authorized by the owner has a lien thereon . . . to the value of the labor or material so furnished, including the costs of the action and a reasonable attorney's fee which must be determined by the court in which the action is brought but only if the party seeking to enforce the lien prevails. If the party defending against the lien prevails, the defending party *must* be awarded costs of the action and a reasonable attorney's fee as determined by the court. . . . (Emphasis added.)

First, we note that both parties have mistakenly in combination applied the provisions of the two Code Sections to the attorney fee dispute in this case. The South Carolina Mechanic's Lien Statute recognizes two types of liens—Section 29-5-10 affords a lien to the mechanic or supplier who deals directly with the owner, while Section 29-5-20 is designed to protect the mechanic or supplier who deals with a general contractor or some person other than the owner or his agent. See 25 S.C.L. Rev. 817, Mechanics' Liens in South Carolina; *Lowndes Hill Realty Co. v. Greenville Concrete Co.*, 229 S.C. 619, 93 S.E. (2d) 855 (1956) (A manifest purpose of Section 45-252 [now 29-5-20] is "the protection of one not a party to a contract with the owner, who furnishes labor or material in the improvement of the owner's property, by giving him a lien for such labor or material . . ."); *Williamson v. Hotel Melrose*, 110 S.C. 1, 96 S.E. 407 (1918) (As to a 29-5-10 Lien, "as between the furnisher and the landowner dealing directly with each other, there can be no lien except there shall first be a contract betwixt him who furnishes and him who receives"). T.W. Morton alleges in its complaint a Section 29-5-10 lien and clearly its claim is based on a direct contract with the owner. Therefore, its right to an attorney fee is governed by Section 29-5-10 and not by Section 29-5-20.

The question next presented is whether Section 29-5-10 mandates the award of an attorney fee to T.W. Morton under the facts of this case. We hold that it does.

South Carolina Code of Laws, 1962 Section 45-251, the predecessor to Section 29-5-10, provided a mechanic or supplier of materials a lien "to secure payment of the debt so due him, and the costs which may arise in enforcing such lien under this chapter, including a reasonable attorney's fee. . . ." The allowance of attorney fees under this Section was considered mandatory in view of the fact that the allowance was included in the lien, *See* 38 S.C.L. Rev. 823, Recovery of Attorneys' Fee As Costs or Damages In South Carolina, although the amount of the award was discretionary with the court. *D.A. Davis Construction Company, Inc. v. Palmetto Properties, Inc.* 281 S.C. 415, 315 S.E. (2d) 370 (1984).

In *Southeastern Home Building & Refurbishing, Inc. v. Platt*, 283 S.C. 602, 325 S.E. (2d) 328 (1985), the Supreme Court declared the attorneys' fees provisions of Sections 29-5-10 and 29-5-20 unconstitutional. The court found that by allowing a prevailing mechanic or supplier to recover attorney fees while denying that right to an owner who successfully defends a mechanic lien action amounted to a denial of equal protection of the laws. In response to the *Platt* decision, the Legislature enacted Act No. 408, Act and Joint Resolutions of the General Assembly of South Carolina, 1986. Importantly, the Act is entitled:

AN ACT TO AMEND SECTION 29-5-10, AS AMENDED, CODE OF LAWS OF SOUTH CAROLINA, 1976, RELATING TO MECHANICS' LIENS, SO AS TO INCLUDE PLAN PREPARATION, SPECIFICATIONS, AND DESIGN DRAWINGS WITHIN THE DEFINITION OF "LABOR PERFORMED" UNDER THIS SECTION AND TO PROVIDE THAT THE PREVAILING PARTY IN AN ACTION TO ENFORCE THE LIEN *MAY RECOVER* COSTS AND ATTORNEYS' FEES . . . ; TO AMEND SECTION 29-5-20 . . . TO PROVIDE THAT THE PREVAILING PARTY IN AN ACTION TO ENFORCE THE LIEN *MAY RECOVER* COSTS AND ATTORNEYS' FEES AND TO PROVIDE A PROCEDURE FOR SETTLING CLAIMS AND DETERMINING WHO IS THE PREVAILING PARTY.

(Emphasis supplied.)

The von Buedingens' argue that the use of the words "may" in the statute grants to the trial court the discretion to deny an award of attorneys' fees. A basic rule of statutory construction is that words in a statute must be given their plain and ordinary meaning. *Adkins v. Varn*, — S.C. —, 439 S.E. (2d) 822 (1993). Ordinarily, the use of the word "may" in a statute signifies permission and generally means the action spoken of is optional or discretionary. *Robertson v. State*, 276 S.C. 356, 278 S.E. (2d) 770 (1981). But, when the question arises whether "may" is to be interpreted as mandatory or permissive in a particular statute, legislative intent is controlling. *Id.* And the use of the word "may" in a statute can be interpreted to mean "shall." *Id.* This is especially so where the original statute used the term "shall" but a later amendment uses the term "may," and there is no explanation for the change in terminology. *Id.* In interpreting the interchangeability of the word "may" and "shall" in statutes, other jurisdictions have held that "may" will be construed as "shall." or as imposing an imperative duty whenever it is employed in a statute to delegate a power, the exercise of which is important for the protection of a public or private interest. *Puckett v. Sellars*, 235 N.C. 264, 69 S.E. (2d) 497 (1952). Accord, *Independent Bankers Assoc. of Ga., Inc. v. Dunn*, 230 Ga. 345, 197 S.E.(2d) 129 (1973).

We hold that there is no indication the Legislature by amending Sections 29-5-10 and 29-5-20 intended to provide for disparate treatment of prevailing mechanics and suppliers who deal directly with the owner under Section 29-5-10 and prevailing mechanics and suppliers who furnish labor or material through a contractor under 29-5-20. Such a scheme would have no rational basis in fact and would create the same kind of unequal treatment the amendment was enacted to cure. Additionally, the title to the Act reflects an intention to treat Sections 29-5-10 and 29-5-20 claimants the same in terms of attorney fees. *See Lindsay v. Southern Farm Bureau Cas. Ins. Co.*, 258 S.C. 272, 188 S.E. (2d) 374 (1972) (court may consider the title of Act in aid of construction to show intent of the Legislature); Accord *The Lite House, Inc. v. J.C. Roy Co.*, 309 S.C. 50, 419 S.E. (2d) 817 (Ct. App. 1992). Moreover, the statute can reasonably be read as empowering a Section 29-5-10 claimant to recover attorney fees, and not, as suggested by

von Buedingen, in the sense of importing discretion in the trial court. The Legislature could have said the trial court "may award" attorneys' fees, thus, clearly importing discretion to award attorneys' fees.

We therefore hold that in order to protect the private interest of contractors, like T.W. Morton who deal directly with an owner, "may" as used in Section 29-5-10 should be interpreted to mean that costs, to include a reasonable attorney's fee shall be secured by the mechanic lien, as is the case in Section 29-5-20. We further hold that because the statute refers to a "reasonable attorney's fee" and because it also states the "fee must be determined by the court," the amount of the fee to be awarded is left to the sound discretion of the court, subject to the guidance set forth in 29-5-10 as to who is a prevailing party.

Clearly, under the guidance set forth in Section 29-5-10, T.W. Morton is a prevailing party and is entitled to an attorney fee in some amount. Accordingly, we reverse and remand the issue of attorneys' fees to the trial court.

## VI.

Finally, T.W. Morton appeals the master's finding that its warranty period began to run instead from the point the owner's architect issued a certificate of substantial completion.

The master declared that the contractor's warranty would run from May 5, 1992. T.W. Morton argues the warranty period, if any, should begin to run on April 1, 1991, the date of substantial completion. T.W. Morton does not, however, raise any potential prejudice in the commencement date of the warranty. Accordingly, we do not address whether the master erred in not choosing April 1, 1991 as the date on which the contractor's warranties should commence. *See Visual Graphics Leasing Corp., Inc. v. Lucia,* — S.C. —, 429 S.E. (2d) 839 (Ct. App. 1993) (error not reversible unless material and prejudicial to the substantial rights of appellant).

For the foregoing reasons, the order below is

Affirmed in part, reversed in part and remanded.