795 S.E.2d 290

Ken BRUNING, Janet Bruning, David Feron, individually and as Trustee; Mary Feron, individually and as Trustee; Sally Saegmuller Haley and Terrell Page Haley, Individually and Co-trustees; Martha James and Don Haarmeyer, Individually and as Co–Trustees; and Pamela S. North, Appellants,

v.

SCDHEC and Cat Island POA, c/o Gary Meyer, Respondents.

In re: Garfield Park Phase 3.

Cat Island POA, c/o Gary Meyer, Petitioner,

v.

SCDHEC, Respondent.

In re: Garfield Park Phase 3.

Appellate Case No. 2014–002010
Opinion No. 5449

Court of Appeals of South Carolina.

Heard May 4, 2016
Filed October 26, 2016
Rehearing Denied January 20, 2017

538

540

John E. North, Jr., of North & Black, PC, of Beaufort, for Appellants.

Mary Duncan Shahid, Stephen Peterson Groves, Sr., and Angelica M. Colwell, all of Nexsen Pruet, LLC, of Charleston, for Respondent Cat Island POA, and Nathan Michael Haber, of Charleston, for Respondent South Carolina Department of Health and Environmental Control.

KONDUROS, J.:

Ken Bruning and other homeowners in the Rookery subdivision of Cat Island (collectively, Appellants) in Beaufort County challenged the issuance of a National Pollutant Discharge Elimination System (NPDES) permit to Cat Island POA regarding stormwater management for Garfield Park, Phase 3, another subdivision on Cat Island. Appellants appeal the Administrative Law Court's (ALC's) order affirming the issuance of the permit raising numerous grounds. We reverse in part based on the misinterpretation of a provision of the Coastal Management Program (CMP) Document. We affirm

other issues based on substantial evidence in the record, and we decline to address certain issues as they are no longer relevant in light of the disposition of other issues.

## FACTS/PROCEDURAL BACKGROUND

Appellants are homeowners in the Rookery subdivision of Cat Island where their property is adjacent to a seven-acre lake (the Lake) that served as a detention pond for stormwater management. The dike creating the Lake was built between 1960 to 1965, prior to the implementation of stormwater control regulations. The Lake abuts Chowan Creek, which flows into the Atlantic Ocean. Construction of the Garfield Park development began in 2004, after the implementation of stormwater management regulations. Cat Island POA, the developer, obtained a NPDES permit that authorized detention of stormwater in the Lake as the stormwater management method for Garfield Park.

In 2009, the dike began to crack, allowing the fresh water in the Lake to empty into Chowan Creek and permitting salt water to ebb and flow into and out of the Lake bed. The dike was never repaired, and the Lake transformed into a muddy, marshy area. Cat Island POA sought a permit from the South Carolina Department of Health and Environmental Control (DHEC) to manage stormwater from Garfield park by using in-line filters or "curb inlet baskets." These baskets would allow stormwater to flow through while catching sediment and other pollutants, preventing their passage into Chowan Creek. As a result, the Lake would no longer serve as a detention pond and eventually would naturalize back into marshland.

NPDES permit requests are reviewed by the Stormwater Permitting division of DHEC along with the Ocean and Coastal Resources Management Division (OCRM) of DHEC to ensure the proposed stormwater treatment is consistent with the CMP Document. DHEC approved Cat Island POA's application for the baskets. Appellants petitioned DHEC to revoke the permit based on numerous regulatory violations and deleterious effects the abandonment of the Lake would have on the environment and their property.

The DHEC Board (the Board) found the majority of Appellants' arguments unpersuasive. However, the Board did agree with Appellants regarding a provision of the CMP Document

governing stormwater runoff and proximity to shellfish beds. Because DHEC had not considered the location of the shellfish beds at high tide, the Board determined DHEC's measurements were insufficient to establish the required distance from the beds.

Appellants challenged the Board's order as to the ruling on its numerous and varied alleged violations. DHEC and Cat Island POA (collectively, Respondents) appealed the portion of the Board's order finding they had not established sufficient distance from the shellfish beds to be consistent with the governing requirements of the CMP. The ALC reversed the Board's finding DHEC's shellfish bed measurement was insufficient and affirmed the Board's other conclusions. This resulted in the issuance of the permit being approved in toto. This appeal followed.

**STANDARD OF REVIEW**

■ According to section 1–23–610 of the South Carolina Code (Supp. 2015), "[t]he review of the administrative law judge's order must be confined to the record. The court may not substitute its judgment for the judgment of the administrative law judge as to the weight of evidence on questions of fact." Appellate courts confine their analysis of an ALC decision to whether it is:

(a) in violation of constitutional or statutory provisions;

(b) in excess of the statutory authority of the agency;

(c) made upon unlawful procedure;

(d) affected by other error of law;

(e) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(f) arbitrary or capricious or characterized by an abuse of discretion or clearly unwarranted exercise of discretion.

S.C. Code Ann. § 1–23–610(B). "In determining whether the ALC's decision was supported by substantial evidence, the court need only find, looking at the entire record on appeal, evidence from which reasonable minds could reach the same conclusion as the ALC." *Kiawah Dev. Partners, II v. S.C. Dep't of Health & Envtl. Control*, 411 S.C. 16, 28, 766 S.E.2d 707, 715 (2014). Still, the court may reverse the decision of the

ALC if it is based on an error of law or in violation of a statutory provision. *Id.*

## LAW/ANALYSIS

### I. Interpretation of CMP Provision Section XIII(A)

 Appellants argue the ALC erred in concluding Cat Island POA's NPDES permit was compliant with Chapter III, Section C(3)(XIII)(A) of the CMP Document entitled Storm-water Runoff Storage Requirements. We agree.

Section C(3)(XIII)(A) states:

For all projects, regardless of size, which are located within one-half (1/2) mile of a receiving water body in the coastal zone, this criteria shall be storage of the first 1/2 inch of runoff from the entire site or storage of the first one (1) inch of runoff from the built-upon portion of the property, whichever is greater. Storage may be accomplished through retention, detention or infiltration systems, as appropriate for the specific site.

The ALC concluded the language in this provision is "permissive, not mandatory: 'Storage *may* be accomplished through retention, detention or infiltration systems, as appropriate for the specific site.' " (emphasis added by ALC) (quoting Chapter III, Section C(3)(XIII)(A) of the CMP Document). Respondents assert, and the ALC agreed, the use of the term "may" and the phrase "as appropriate for the specific site" provide DHEC with latitude to permit use of the curb inlet baskets proposed in Cat Island POA's permit application.[1] We disagree.

 "The issue of interpretation of a statute is a question of law for the court." *State v. Sweat*, 379 S.C. 367, 373, 665

---

1. Additionally, the ALC relied upon Regulation 72–301(5) of the South Carolina Code (2012), which addresses "Best Management Practices" in finding this provision permissive. Regulation 72–301(5) defines "Best Management Practices" as "a wide range of management procedures, schedules of activities, prohibitions on practices and other management practices which have been demonstrated to effectively control the quality and/or quantity of stormwater runoff and which are compatible with the planned land use." The ALC's order also cites to Regulation 72–305(B)(3) of the South Carolina Code (2012), which indicates for sites less than ten disturbed acres, "the use of measures other than ponds to achieve water quality improvements are recommended."

S.E.2d 645, 648 (Ct. App. 2008). "We recognize the court generally gives deference to an administrative agency's interpretation of an applicable statute or its own regulation. Nevertheless, where ... the plain language of the statute is contrary to the agency's interpretation, the Court will reject the agency's interpretation." *Brown v. Bi–Lo, Inc.*, 354 S.C. 436, 440, 581 S.E.2d 836, 838 (2003) (citation omitted). "Regulations are interpreted using the same rules of construction as statutes." *Murphy v. S.C. Dep't of Health & Envtl. Control*, 396 S.C. 633, 639, 723 S.E.2d 191, 195 (2012). "If the statute or regulation 'is silent or ambiguous with respect to the specific issue,' the court then must give deference to the agency's interpretation of the statute or regulation, assuming the interpretation is worthy of deference.'" *Kiawah Dev. Partners, II*, 411 S.C. at 33, 766 S.E.2d at 717 (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Generally, "[a] specific statutory provision prevails over a more general one." *Wooten ex rel. Wooten v. S.C. Dep't of Transp.*, 333 S.C. 464, 468, 511 S.E.2d 355, 357 (1999). "The use of the word 'may' signifies permission and generally means that the action spoken of is optional or discretionary unless it appears to require that it be given any other meaning...." *Kennedy v. S.C. Retirement Sys.*, 345 S.C. 339, 352–53, 549 S.E.2d 243, 250 (2001) (holding "may" could not reasonably be interpreted to mean the inclusion of an employee's unpaid leave in the calculation of retirement benefits was optional, but merely contemplated that some retirees may not have unpaid leave to include); *see also Robertson v. State*, 276 S.C. 356, 358–59, 278 S.E.2d 770, 771 (1981) (interpreting "may" as a mandatory term based on the context and legislative history of a statute proscribing certain jurisdiction in magistrate's court); *T.W. Morton Builders, Inc. v. Buedingen*, 316 S.C. 388, 402–03, 450 S.E.2d 87, 97 (1994) (concluding "may" was mandatory in a provision dealing with attorney's fees secured by a mechanic's lien). "The canon of construction *'expressio unius est exclusio alterius'* or *'inclusio unius est exclusio alterius'* holds that 'to express or include one thing implies the exclusion of another, or of the alternative.'" *Hodges v. Rainey*, 341 S.C. 79, 86, 533 S.E.2d 578, 582 (2000). When interpreting a law, courts must presume a futile

act was not intended and that the law intends to accomplish something. *Sweat*, 379 S.C. at 377, 665 S.E.2d at 651.

Applying the various rules of construction cited above, we conclude the ALC erred in construing the provision to permit use of the curb inlet baskets. Section C (3)(XIII)(A) states the first half inch of runoff "shall" be stored. Therefore, the requirement of storage is mandatory. Richard Geer, the DHEC engineer associate who reviewed and approved the permit application, testified at the hearing. With regard to the basket system, he stated "[i]t doesn't store. It filters that half inch of runoff."

Section C(3)(XIII)(A) further provides three options by which storage may be accomplished—detention, retention, and infiltration. With respect to infiltration, it is defined as "the passage or movement of water through the soil profile." S.C. Code Ann. Regs. 72–301(22) (2012). Infiltration inherently provides for storage as stormwater does not flow directly into the receiving body, but leeches into the soil profile over a period of time. Geer testified, and Respondents concede, the curb inlet baskets are not a method of infiltration. The use of the term "may" does not automatically render the requirements of this provision optional. Applying the maxim *inclusio unius est exclusio alterius*, the inclusion of the three named alternatives—retention, detention, and infiltration—as options implies other methods of treating the stormwater are excluded. Furthermore, the Best Management Practices cited to in the ALC's order are general, while the provision governing the storage of runoff in this case is specific and therefore, controlling.

Finally, the language "as appropriate for the site" cannot give unfettered discretion to permit a method of stormwater treatment that does not otherwise meet the established criteria. Such a construction would render the provision meaningless and futile. Reasonably interpreted, that language simply provides DHEC with the authority to consider that one of the three enumerated methods of stormwater management may not be appropriate for a particular site based on factors such as the soil profile.

Based on all of the foregoing, we conclude the ALC misinterpreted this provision as permissive. Therefore, because the

method of stormwater management approved in Cat Island POA's permit is inconsistent with this provision, the permit should not have been granted, and the ALC's decision affirming that approval is reversed.

## II. Modification of Existing Permit

■ Next, Appellants argue Cat Island POA had an ongoing obligation to maintain the stormwater treatment system approved in 2004 and in order to modify that system, the developer must show a condition for modification was present under the applicable regulations. According to Regulation 61–9.122.62(a):

> When the Department receives any information (for example, inspects the facility, receives information submitted by the permittee as required in the permit (see section 122.41), receives a request for modification or revocation and reissuance under section 124.5, or conducts a review of the permit file), it may determine whether or not one or more of the causes listed in paragraph (d) and (e) of this section for modification or revocation and reissuance or both exist.

S.C. Code Ann. Regs. 61–9.122.62(a) (2011). One of the justifications for modification listed in subsection (d) of the regulation states modification may be allowed if there are "material and substantial alterations to the permitted facility ... which justify the application of permit conditions that are different or absent in the existing permit." S.C. Code Ann. Regs. 61–9.122.62(d)(1) (2011).

Geer testified the regulations are binding on OCRM and the retrofit project. He further testified the regulation appeared "to allow for the modification that was requested." However, he also stated he had not read through the regulation but opined a request for modification made under the regulation could have been granted due to "material and substantial alterations or additions to the permitted facility" quoting the language from subsection (d)(1).

While this regulation was raised to the ALC, it was not addressed in the final order. Appellants raised the issue again in their motion to reconsider. The ALC denied the motion and did not mention this regulation or its applicability to the case.

We conclude Cat Island POA's Application constituted a modification and DHEC should have considered it as such under the applicable regulations. We cannot determine from the record whether circumstances justifying a modification pursuant to Regulation 61-9.122.62(d) of the South Carolina Code existed. However, even if such circumstances were present, the curb inlet baskets still do not meet the requirements of the provision discussed in Section I of this opinion. Therefore, although we determine the modification regulations should have been considered, we do not decide whether this change was a permissible modification.

### III. Waiver of Water Quantity Requirements

Appellants contend the ALC erred in affirming DHEC's decision to waive certain water quantity requirements for NPDES permits pursuant to Regulation 72-302(b)(2)(a) of the South Carolina Code (2012). This issue relates specifically to DHEC's evaluation of Cat Island POA's application assuming the curb inlet baskets were an otherwise appropriate method of stormwater treatment. Because we determined the permit should not have been granted based on its inconsistency with Chapter III, Section C(3)(XIII)(A) of the CMP document, Stormwater Runoff Storage Requirements, we decline to address this issue. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding an appellate court need not address an issue when the determination of another issue is dispositive).

### IV. Alteration of the Critical Area

Under the Coastal Tidelands Act and the CMP document, when dealing with a critical area, DHEC is required to consider the extent to which a project would impact the environment. S.C. Code Ann. § 48-39-30 (2008). "Critical area" is defined as "(1) coastal waters; (2) tidelands; (3) beaches; [or] (4) beach/dune system which is the area from the mean high-water mark to the setback line as determined in [s]ection 48-39-280." S.C. Code Ann. § 48-39-10(J) (2008).

The ALC determined the Retrofit Project does not alter the critical area and even if it did, it would be exempt under section 48-39-130(D)(3) of the South Carolina Code (2008).

According to that section of the Coastal Tidelands Act, it is not necessary to apply for a permit if the activity is "[t]he discharge of treated effluent as permitted by law; provided, however, that the department shall have the authority to review and comment on all proposed permits that would affect critical areas." § 48–39–130(D)(3). Further, the ALC found the Retrofit Project was to be conducted in the uplands rather than in the critical area and the alteration to the critical area happened in the 1960s when the dike was installed and a tidal salt marsh became an open water pond.

We do not need to reach this issue, as we hold the Retrofit Project was approved in violation of Chapter III, Section C(3)(XIII)(A) of the CMP Document.

### V. Proximity to Shellfish Beds [2]

Appellants contend the ALC erred in reversing the Board's decision finding DHEC's measurements from the stormwater flow to nearby shellfish beds insufficient to support DHEC's approval of the NPDES permit. We disagree.

Chapter III, Section C(3)(XIII)(A) of the CMP Document, Stormwater Runoff Storage Requirements, previously discussed in Section I, goes on to address the proximity of stormwater runoff to shellfish beds. It states: "In addition, for those projects which are located within 1,000 (one-thousand) feet of shellfish beds, the first one and one-half (1 1/2) inches of runoff from the built-upon portion of the property must be retained on site."[3] The ALC found the shellfish beds were not within the one thousand-foot zone.

---

2. Because this issue is not tied directly to using curb inlet baskets to manage stormwater from Garfield Park, and for the sake of judicial economy, we will address it. *See Zabinski v. Bright Acres Assocs.*, 346 S.C. 580, 599, 553 S.E.2d 110, 119 (2001) (addressing an issue for the sake of judicial economy and to prevent further litigation between the parties).

3. We conclude the issue regarding the term "located" as framed by the dissent is not specifically argued by Appellants on appeal, nor was it presented below. Therefore, we do not believe this precise issue is preserved for review. *See S.C. Dep't of Transp. v. First Carolina Corp. of S.C.*, 372 S.C. 295, 301–02, 641 S.E.2d 903, 907 (2007) ("There are four basic requirements to preserving issues at trial for appellate review. The issue must have been (1) raised to and ruled upon by the trial court, (2)

To determine whether the permit would violate the 1,000 foot prohibition, DHEC and Cat Island POA's engineer measured the path stormwater would follow from the nearest outfall pipe for Garfield Park toward the shellfish bed. This path was a "defined drainage pathway" in the bottom of Chowan Creek and measured at low tide. On appeal, the Board determined DHEC's measurements were insufficient because they did not take high tide into consideration and because stormwater moving through high tide would take a more direct path toward the shellfish bed rather than following the trench drainage path. Respondents appealed that determination.

At the hearing, Respondents submitted measurements that did consider high tide—a measurement of 1,002 feet. Appellants continued to contend their measurements were correct. Those measurements were made from a different outfall pipe it believed carried stormwater from Garfield Park and gave far less consideration to the defined drainage pathway. The ALC determined Respondents' measurements were more credible than those taken by Appellants' surveyor and engineer. Appellants argue in their brief that Respondents admit their measurements were from the wrong starting point. However, a closer reading of the testimony indicates this is a mischaracterization. Geer answered questions posed as hypotheticals, and never indicated his measurement was from an incorrect starting point.

It is somewhat concerning that Respondents' measurements are so close to the prohibited area. Such a case may warrant erring on the side of caution and protecting the shellfish beds. However, the 1,000–foot distance is an established bright line, and the appellate court is not to substitute its judgment for that of the ALC. *See Dreher v. S.C. Dep't of Health & Envtl. Control*, 412 S.C. 244, 249, 772 S.E.2d 505, 508 (2015) ("An appellate court may not substitute its judgment for the judg-

raised by the appellant, (3) raised in a timely manner, and (4) raised to the trial court with sufficient specificity." (quoting Jean Hoefer Toal et al., *Appellate Practice in South Carolina* 57 (2d ed. 2002))). Furthermore, we are not persuaded the term located, in the context of a regulation concerning the flow of stormwater, would necessarily be controlled by the interpretation of that term in the types of cases relied upon by the dissent.

ment of the ALC as to the weight of the evidence on questions of fact."). Because reasonable minds could reach the same conclusion as the ALC, we conclude substantial evidence in the record supported its findings on this issue. *See Murphy*, 396 S.C. at 639, 723 S.E.2d at 94–95 (2012) ("When finding substantial evidence to support the ALC's decision, the court need only determine that, based on the record as a whole, reasonable minds could reach the same conclusion.").

## VI. Consistency with the CMP

Appellants argue the Retrofit Project was not consistent to the maximum extent practicable with the CMP and therefore, the ALC erred in approving it. Because we find the ALC erred in its reading of Chapter III, Section 3(C)(XIII)(A) of the CMP Document, we agree the Retrofit Project was not consistent to the maximum extent practicable with the CMP.

## VII. Alteration of Freshwater or Brackish Wetlands

Appellants contend the ALC erred in approving DHEC's granting the NPDES permit because the permit will violate the section of the CMP governing residential development that states, "Residential development which would require filling or other permanent alteration of salt, brackish or freshwater wetlands will be prohibited, unless no feasible alternative exist or an overriding public interest can be demonstrated, and any substantial environmental damage can be minimized."

Again, this issue relates specifically to DHEC's evaluation of Cat Island POA's NPDES permit application assuming the curb inlet baskets were an otherwise appropriate method of stormwater treatment. Because we determined the permit should not have been granted based its inconsistency with Chapter III, Section 3(C)(XIII)(A) of the CMP Document, Stormwater Runoff Storage Requirements, we decline to address this issue. *See* Futch, 335 S.C. at 613, 518 S.E.2d at 598 (holding an appellate court need not address an issue when the determination of another issue is dispositive).

## VIII. Stormwater Treatment for Tabby Park

Appellants argue the ALC erred in approving the permit because it eliminated the proper stormwater treatment

for Tabby Park, an adjacent subdivision on Cat Island. We disagree.

According to the ALC's order, Appellants did not produce evidence to refute DHEC's conclusion that none of the other developments on Cat Island relied on the Lake for stormwater treatment. Further, the ALC noted Appellant's engineer, Christopher Moore, agreed the permitting file for Tabby Park contained no information showing reliance on the Lake. Moore was asked if he saw any indication Tabby Park relied upon the Lake to detain water. He answered "[f]rom the information that I saw or that I had access to, I did not see anything." We agree with Respondents and the ALC the record contains no evidence of Tabby Park's reliance on the lake for its stormwater treatment. Therefore, DHEC was not required to consider the Retrofit Project's effect on that subdivision.

### IX. Repair of the Dike

■ Appellants argue the ALC erred in not requiring Cat Island POA to repair the dike pursuant to the agreement between DHEC and Cat Island POA that was part of the 2004 NPDES permit for Garfield Park. We disagree.

■ "[I]f a contract is made for the benefit of a third person, that person may enforce the contract if the contracting parties intended to create a direct, rather than an incidental or consequential, benefit to such third person." *Bob Hammond Constr. Co. v. Banks Constr. Co.*, 312 S.C. 422, 424, 440 S.E.2d 890, 891 (Ct. App. 1994).

The agreement to keep the dike in repair is an underlying obligation intrinsically tied to the 2004 NPDES permit. Cat Island POA is not restricted from managing Garfield Park's stormwater in a different way, provided that method is consistent with the applicable governing statutes, regulations, and provisions. While Appellants are incidental beneficiaries of the method of stormwater treatment contemplated by the 2004 permit—living adjacent to a seven-acre lake—they lack standing to compel DHEC to force repair of the dike.

### CONCLUSION

We reverse the ALC's finding Cat Island POA's NPDES permit application was in compliance with Chapter III, Sec-

tion 3(C)(XIII)(A) of the CMP Document. We further conclude the NPDES permit application did constitute a modification of the 2004 permit and therefore should have been evaluated under the relevant provisions related to modifications of permits. Additionally, for the sake of judicial economy, we affirm the ALC's finding the shellfish beds of Chowan Creek were outside the one thousand-foot area requiring retention of stormwater on site, affirm the ALC's conclusion treatment of stormwater for Tabby Park via the detention pond was not established at trial, and affirm the ALC's ruling Appellants could not compel DHEC to force repair of the dike pursuant to the agreement between DHEC and Cat Island POA. We decline to address the remaining issues raised as they relate to evaluation of the Cat Island POA's NPDES permit application providing for the use of curb inlet baskets. Therefore, the ALC's order is

## AFFIRMED IN PART AND REVERSED IN PART.

HUFF, J., concurs.

GEATHERS, J., concurring in part and dissenting in part in a separate opinion:

I concur with most of the majority opinion. However, I must depart with the majority's analysis in section V pertaining to the project's proximity to shellfish beds.

Initially, I disagree with the majority's statement that the question of interpreting the shellfish bed provision in the Stormwater Runoff Storage Requirements is unpreserved. In Appellants' request for a contested case hearing, they referenced, through incorporation of an attached exhibit, the shellfish bed provision as one of the grounds on which they sought a hearing. This ground logically subsumes the question of the provision's interpretation, as evidenced by the ALC's discussion of interpretation in its order. Further, the ALC noted that Appellants submitted a survey reflecting "a straight line path of the stormwater flow." Appellants referenced this straight-line survey as well as their rope measurements in their opening statement at the hearing. Moreover, Appellants sufficiently argued in their appellate brief that the provision's plain language requires a direct measurement rather than the serpentine measurement employed by DHEC: "Nowhere in

the CMP is there any description of a distance based on some alleged winding drainage pathway. The language simply and clearly refers to projects 'which are located' within 1,000 feet of shellfish beds. The ALC erred when it failed to simply determine that distance without regard to some winding pathway for the stormwater."

Accordingly, the question of the provision's interpretation is undoubtedly preserved for review. Even if there were some doubt as to preservation, we note Cat Island POA and DHEC have not asserted in their joint brief that this question is unpreserved. *See Atl. Coast Builders & Contractors, LLC v. Lewis*, 398 S.C. 323, 333, 730 S.E.2d 282, 287 (2012), Toal, C.J. (concurring in result in part and dissenting in part) ("[W]here the question of preservation is subject to multiple interpretations, any doubt should be resolved in favor of preservation. When the opposing party does not raise a preservation issue on appeal, courts are not precluded from finding the issue unpreserved if the error is clear. However, the silence of an adversary should serve as an indicator to the court of the obscurity of the purported procedural flaw."). Therefore, I would resolve any possible doubt as to preservation in favor of Appellants on this important question.

Additionally, I disagree with the majority's application of the substantial evidence rule to the ALC's findings concerning shellfish beds before addressing whether those findings are based on a correct reading of the law. *See* S.C. Code Ann. § 1–23–610(B)(d) (Supp. 2015) (allowing this court to reverse the ALC's decision if it is affected by an error of law). The underlying question of law raised by Appellants is whether the retention requirement for projects within 1,000 feet of shellfish beds allows the method of measurement used by DHEC in this case.

"In interpreting a statute,[4] the court will give words their plain and ordinary meaning, and will not resort to forced construction that would limit or expand the statute." *State v. Johnson*, 396 S.C. 182, 188, 720 S.E.2d 516, 520 (Ct. App. 2011). The plain language of the CMP Document's Stormwater

---

4. Regulations are interpreted using the rules of statutory construction. *Murphy v. S.C. Dep't of Health & Envtl. Control*, 396 S.C. 633, 639, 723 S.E.2d 191, 195 (2012).

Runoff Storage Requirements states, in pertinent part, "[F]or those projects which are *located within 1,000 (one thousand) feet* of shellfish beds, the first one and one half (1 1/2) inches of runoff from the built-upon portion of the property must be retained on site." (emphasis added). There are no words directing that the distance between the project and the shellfish beds be measured in any way other than a straight line. *Cf. Rest. Row Assocs. v. Horry Cty.*, 335 S.C. 209, 220–21, 516 S.E.2d 442, 448 (1999) (discussing a zoning ordinance prohibiting the location of an adult entertainment establishment within 500 feet of a residential district and stating, "This Court requires distance measurements of this nature be done 'as the crow flies'" (citing *Brown v. State*, 333 S.C. 238, 240–41, 510 S.E.2d 212, 213 (1998))); *Brown*, 333 S.C. at 240–41, 510 S.E.2d at 213 (discussing a statute prohibiting distribution of a controlled substance within one-half mile radius of a school and stating, "Courts addressing the issue have uniformly held proximity is measured in a straight line, or 'as the crow flies'").[5]

While the interpretation of a statute by the agency charged with its administration "will be accorded the most respectful

---

**5.** *Compare Evans v. Thompson*, 298 S.C. 160, 162–63, 378 S.E.2d 618, 620 (Ct. App. 1989) (discussing a statute prohibiting the issuance of a mini bottle license to a business located within 300 feet of a church, school or playground as measured by the shortest route of ordinary pedestrian or vehicular travel along the public thoroughfare, and stating, "The statute is *explicit* in requiring that the route be over a public thoroughfare; the route prescribed by the [Alcoholic Beverage Control] Commission is not over a public thoroughfare; it is therefore erroneous" (emphasis added)), *with Taylor Drug Stores, Inc. v. Ind. Alcoholic Beverage Comm'n*, 497 N.E.2d 932, 936 (Ind. Ct. App. 1986) (discussing a statute prohibiting the issuance of a permit to sell alcoholic beverage for premises if a wall of the premises is within 200 feet from a wall of a school or church and stating, "In interpreting the appropriate means of measurement, we are guided by the terms within the statute. A statute may specify the precise terminal points to be used in a measurement, but in the absence of an express provision, the general rule is that measurement should be along *the shortest straight line* connecting a church and the proposed premises, regardless of intervening obstacles. [The license applicant's] initial argument, that the measurement should be based on a line of pedestrian travel from doorway to doorway, *strains our reading of the plain and ordinary meaning of the statute.* Nowhere does the statute state that the proposed premises must not be situated within a 'walking' distance of 200 feet from a church 'doorway'" (emphases added) (citations omitted)).

consideration," an agency's interpretation "affords no basis for the perpetuation of a patently erroneous application of the statute." *State v. Sweat*, 386 S.C. 339, 351, 688 S.E.2d 569, 575–76 (2010) (quotation marks omitted); *see also Kiawah Dev. Partners, II v. S.C. Dep't of Health & Envtl. Control*, 411 S.C. 16, 34–35, 766 S.E.2d 707, 718 (2014) ("We defer to an agency interpretation unless it is 'arbitrary, capricious, or manifestly contrary to the statute.'") (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)); *id.* at 39, 766 S.E.2d at 720–21 ("Our role is to apply and interpret, not rewrite, regulations. Where the language of a regulation is plain, unambiguous, and conveys a clear and definite meaning, interpretation of the regulation is unnecessary and improper."); *Paschal v. State Election Comm'n*, 317 S.C. 434, 436, 454 S.E.2d 890, 892 (1995) ("If a statute's language is plain and unambiguous, and conveys a clear and definite meaning, there is no occasion for employing rules of statutory interpretation and the court has no right to look for or impose another meaning. Where the terms of the statute are clear, the court must apply those terms according to their literal meaning." (citation omitted)).

It is undisputed that neither DHEC nor Cat Island POA measured the distance between the project and the shellfish beds in a straight line. Therefore, I would reverse the ALC's conclusion that deference should be given to DHEC's interpretation of the shellfish bed provision in the CMP Document's Stormwater Runoff Storage Requirements, and I would reverse the ALC's findings concerning the distance between the project and the shellfish beds because they are based on this error of law.

Based on the foregoing, I concur in reversing the ALC's order upholding DHEC staff's Consistency Determination, but I respectfully dissent from affirming the ALC's findings pertaining to the distance between the project and shellfish beds.