# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Thomas J. Torrence, Respondent,

v.

South Carolina Department of Corrections, Appellant.

Appellate Case No. 2016-000285

———————

Appeal From The Administrative Law Court
Deborah Brooks Durden, Administrative Law Judge

———————

Opinion No. 5829
Submitted May 26, 2021 – Filed June 30, 2021

———————

**AFFIRMED**

———————

Lake E. Summers, of Malone, Thompson, Summers &
Ott, LLC, of Columbia, for Appellant.

Thomas J. Torrence, pro se.

———————

**HUFF, J.:** The South Carolina Department of Corrections (the Department)
appeals two orders of the administrative law court (the ALC), which reversed the
Department's final decision in the matter of inmate Thomas Torrence's grievance
and remanded the case back to the Department to calculate and pay wages to

Torrence in accordance with the Prevailing Wage Statute.[1]  On appeal, the Department argues the ALC erred by: (1) finding Torrence timely filed the grievance at issue, (2) finding the doctrine of equitable tolling applied to Torrence's grievance, (3) calculating the prevailing wage in its order, and (4) finding the Department erred by failing to allow Torrence to designate persons or authorities under section 24-3-40 of the South Carolina Code.[2]  We affirm on the submitted briefs.[3]

## FACTS/PROCEDURAL HISTORY

Torrence is currently serving a life sentence without the possibility of parole. Between June 1997 and November 2004, Torrence participated in the prison industries service project (PIP) operated at Evans Correctional Institution.  During this time, Torrence performed work for Insilco Global Industries/ESCOD (ESCOD).  For the first 320 hours of Torrence's labor, the Department paid him a "training wage" of $0.25 per hour for the first 160 hours and $0.75 per hour for the remaining 160 training hours.  After the completion of his training period, the Department paid Torrence a wage of $5.25 per hour and $7.86 per hour for overtime.

In 2001, Torrence and other inmates filed a class action suit against the Department in the circuit court, seeking a declaratory judgment finding the Department violated South Carolina law by (1) improperly diverting portions of inmate wages, (2) paying inmates less than the prevailing wage, and (3) preventing immediate distribution of inmate wages placed in escrow.  Pursuant to *Wicker*[4] and *Adkins*,[5] the circuit court granted the Department's motion to dismiss, and Torrence

---

[1] S.C. Code Ann. § 24-3-430(D) (2007).

[2] Upon our initial review, this court dismissed the Department's appeal as interlocutory, but our supreme court reversed the dismissal and remanded to this court to address the merits of Department's appeal.  *See Torrence v. S.C. Dep't of Corr.*, ___ S.C. ___, 857 S.E.2d 549 (2021).

[3] We decide this case without oral argument pursuant to Rule 215, SCACR.

[4] *Wicker v. S.C. Dep't of Corr.*, 360 S.C. 421, 602 S.E.2d 56 (2004).

[5] *Adkins v. S.C. Dep't of Corr.*, 360 S.C. 413, 602 S.E.2d 51 (2004).

appealed. The South Carolina Supreme Court subsequently affirmed the circuit court's dismissal, holding inmates do not have a private right of action against the Department but do have a right to pursue their claims through the Department's internal grievance procedure. *See Torrence v. S.C. Dep't of Corr.*, 373 S.C. 586, 593-95, 646 S.E.2d 866, 869-70 (2007).

On May 21, 2007, Torrence submitted a step one grievance raising eight grounds "objecting to the Department's payment, disbursement, and retention of wages" for his work under PIP. Specifically, Torrence argued the Department violated state law by paying him an hourly wage below the prevailing wage in the industry. Torrence argued he was entitled to the difference between his wage and the prevailing wage for his work performed for ESCOD both during and after his training period as well as for any overtime hours. Torrence additionally argued the Department deprived him of his property rights by denying him the option of designating persons or entities to receive immediate distribution of his wages placed in escrow pursuant to section 24-3-40 of the South Carolina Code. Torrence argued that because he was serving a life sentence, he should be allowed to designate persons or entities to receive the escrowed wages for "his personal benefit." On December 1, 2011, the Department denied Torrence's claims, finding Torrence failed to timely file his grievance "within either seven . . . days or even [fifteen] days of the incident upon which [he] anchored the claims . . . presented in [his] [s]tep [one]" as required by Paragraph 13.1 of the Department's Policy GA-01.12.[6] On December 5, 2011, Torrence appealed the Department's decision in a step two grievance, which raised the same grounds as his step one. Additionally, in his step two, Torrence argued the Department erred in finding he failed to timely file his step one because (1) the class action lawsuit, which was filed four years before *Wicker*, tolled the statute of limitations and (2) he filed his step one "immediately" after receiving notice of the supreme court's decision. On February 9, 2012, the Department reiterated its response to Torrence's step one and denied his step two.

---

[6] Paragraph 13.1 of Policy GA-01.12 requires that step one grievances be filed within fifteen days of the alleged incident that led to the grievance.

On May 7, 2012, Torrence appealed to the ALC. The ALC subsequently bifurcated the issues on appeal to determine the timeliness of Torrence's grievance before reaching the merits of his case. On January 30, 2014, the ALC issued an order finding Torrence timely filed his step one. In its order, the ALC found Torrence timely filed his step one because Torrence's claims fell within Paragraph 13.9 of the Department's Policy GA-01.12, which provides "[e]xceptions to the [fifteen-]day time limit requirement will be made for grievances concerning policies/procedures." The ALC noted,

> The Inmate Grievance System Policy fails to define either "incident" or "policies/procedures." . . . Based on the "plain and ordinary meaning" of both of these words, it is clear that an incident would be a one-time, specific event, and a policy would be continuous course of action. In the present case, it was not a one-time event, in which [Torrence] was not paid a prevailing wage. The Department continuously failed to pay [Torrence] a prevailing wage. Therefore, the grievance involved is related to a policy or procedure.
>
> . . . .
>
> Prior to the *Wicker* opinion issued by the [s]upreme [c]ourt, the Department maintained that wage issues were not grievable under the internal grievance system. . . . Thus, any attempt by [Torrence] to file a grievance prior to August 22, 2004[,] would have been futile. By that time, [Torrence's] lawsuit initiated as a class action in [the c]ircuit [c]ourt was pending . . . , representing ongoing litigation between these same parties over the same issue. [Torrence] filed his grievance within fifteen days of the date the [s]upreme [c]ourt issued its decision in his case . . . .

The ALC additionally found Torrence timely filed his step one because his grievance "present[ed] the type of extraordinary circumstances in which fairness demands that the doctrine of equitable tolling be applied." The ALC further stated it would address the merits of Torrence's claims upon receiving the parties' briefs.

On January 21, 2016, the ALC issued its order addressing the merits of Torrence's claims. In its order, the ALC found the Department erred by failing to pay Torrence the prevailing wage for his labor pre- and post-training, stating "there is no construction of law under which the Department could pay [Torrence] less than the prevailing wage." The ALC further stated, "The question then becomes, what is the 'prevailing wage' that must be paid for all hours worked in both the training period and thereafter?" Addressing this question, the ALC stated,

> The [PIP] Guideline . . . states that the prevailing wage must be obtained from the state agency that determines wage rates. . . . In South Carolina, this agency would have been the Employment Security Commission (ESC) at the times relevant to this case, but would now be the Department of Employment and Workforce (DEW).

The ALC continued,

> The Department cites a [c]ircuit [c]ourt order in another case as support for the theory that [s]ection [24-3]-410, and not [s]ection [24-3]-430, governs the wage standard applicable in this case. Not only is this [c]ircuit [c]ourt order not binding, the argument for which it is cited contradicts the statements of the higher courts in this state. This [c]ourt declines to further address the argument that only [s]ection [24-3]-410 applies, noting that the South Carolina Supreme Court has already stated that the program at issue in this case operated under [s]ection 24-3-430.

The ALC continued, "While the [c]ourt agrees that verification of wage rates by the ESC is the method for determining the prevailing wage that the federal [g]uideline and state statutes contemplate, the [c]ourt does not agree that the $5.25 regular hourly rate conforms to the ESC data in the record."  The ALC stated,

> [Torrence] has asked this [c]ourt to determine the prevailing wage based on the record in this case.  In so doing, the [c]ourt reaches an issue not yet addressed by South Carolina courts.  While it has been decided that the Department may not pay less than the prevailing wage during training, no inmate has successfully raised the issue of how the prevailing wage is calculated.

In calculating the prevailing wage, the ALC interpreted section 24-3-430 of the South Carolina Code (2007).  The court stated,

> The Meriam-Webster Dictionary defines "prevail" as "to be frequent: predominate." . . . Predominate is defined as "to hold advantage in numbers or quantity." . . . The affidavit in the record of Rebecca Eleazor of the ESC supports the conclusion that the "average" wage in South Carolina for a given occupational category would be the ordinary interpretation of the statutory phrase prevailing wage.  The [c]ourt therefore concludes that the "prevailing wage" *equals the mean average wage* for an occupation.

> The [PIP] Guideline requires that the prevailing wage must be obtained from the state agency that determines wage rates. . . . Further, the Guideline states that the prevailing wage must be set exclusively in relation to the amount of pay received by similarly situated non-inmate workers and that no other cost variables may be taken into consideration. . . .  In referring to the ESC data in the record, the [c]ourt concludes that "locality" means the state of South Carolina.  Further, the [c]ourt concludes

that the data necessary to determine the mean average wage for "work of a similar nature" as contemplated by the state statutes and federal guidelines may be found by referring to the appropriate Occupational Employment Statistics (OES) or OCC code used by ESC/DEW.

(emphasis added). Based on the aforementioned analysis, the ALC found, "The record simply d[id] not support a finding that the mean average wage for an assembler [was] as low as the $5.25 paid [to Torrence]"; rather, the record showed the mean average wage for an electronic assembler was $8.82 in 1997 and $9.92 for 1998 and 1999. The ALC additionally found "the evidence in the record [was] insufficient to calculate the wage for all of the relevant years," specifically the years 2000 through 2004. It therefore ordered Torrence's claim be remanded to the Department to determine the prevailing wage for the remaining years of Torrence's labor.

Regarding Torrence's access to his escrowed wages, the ALC discussed the parties' varying interpretations of section 24-3-40, stating,

The parties disagree on when [Torrence's] escrowed wages may be distributed to persons or entities of the inmate's choosing—i.e. whether they may be distributed only after the inmate's death. While there is nothing in [section 24-3-40(B)(2)] explicitly stating that the distribution of the funds to persons or entities chosen by the inmate can occur only after the inmate's death, the Department's interpretation of an ambiguous statute that it administers is entitled to deference unless there is a compelling reason to differ. . . .

Applying the principles of statutory construction, the ALC found,

[A] construction of the statute that gives full effect to both [s]ubsections (B)(2) and (A)(5) requires reading [s]ubsection (B)(2) to allow a prisoner serving a life

sentence without opportunity for parole the option of having the escrowed funds distributed to the persons or entities of his choice during his lifetime.

The ALC therefore concluded Torrence "must be allowed the opportunity to designate persons or entities to receive an immediate distribution of funds held in escrow pursuant to [s]ection 24-3-40(A)(5)."

Based on the foregoing, the ALC reversed and remanded the Department's final decision.  This appeal followed.

## STANDARD OF REVIEW

"In an appeal from an ALC decision, the Administrative Procedures Act provides the appropriate standard of review." *Kiawah Dev. Partners, II v. S.C. Dep't of Health & Env't Control*, 411 S.C. 16, 28, 766 S.E.2d 707, 715 (2014).  "Section 1-23-610 of the South Carolina Code ([Supp. 2020]) sets forth the standard of review when the court of appeals is sitting in review of a decision by the ALC on an appeal from an administrative agency." *S.C. Dep't of Corr. v. Mitchell*, 377 S.C. 256, 258, 659 S.E.2d 233, 234 (Ct. App. 2008).  "The review of the [ALC's] order must be confined to the record." S.C. Code Ann. § 1-23-610(B) (Supp. 2020).  "Th[is] court may not substitute its judgment for the judgment of the [ALC] as to the weight of the evidence on questions of fact." *Id.*  "In determining whether the ALC's decision was supported by substantial evidence, th[is c]ourt need only find, . . . evidence from which reasonable minds could reach the same conclusion as the ALC." *Kiawah*, 411 S.C. at 28, 766 S.E.2d at 715.  However, when the issue on review raises a question of law, this court "may reverse the decision of the ALC where it is in violation of a statutory provision or it is affected by an error of law." *Id.*  "Statutory interpretation is a question of law." *Chapman v. S.C. Dep't of Soc. Servs.*, 420 S.C. 184, 188, 801 S.E.2d 401, 403 (Ct. App. 2017) (quoting *S.C. Coastal Conservation League v. S.C. Dep't of Health & Env't Control*, 390 S.C. 418, 425, 702 S.E.2d 246, 250 (2010)).  "Unless there is a compelling reason to the contrary, appellate courts 'defer to an administrative agency's interpretations with respect to the statutes entrusted to its administration or its own regulations.'" *Id.* at 188, 801 S.E.2d at 403 (quoting *Kiawah*, 411 S.C. at

34, 766 S.E.2d at 718); *see also Kiawah*, 411 S.C. at 34-35, 766 S.E.2d at 718 ("We defer to an agency interpretation unless it is 'arbitrary, capricious, or manifestly contrary to the statute.'" (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984))).

**LAW/ANALYSIS**

**I.      TIMELINESS OF GRIEVANCE**

The Department argues the ALC erred in finding Torrence timely filed his step one grievance because he failed to file it within fifteen days of "the date upon which [the Department] began paying Torrence for his labor," as required by Paragraph 13.1 of Policy GA-01.12.  The Department contends the ALC erred in finding Torrence's grievance fell within the filing exception under Paragraph 13.9 because Torrence did not specifically allege his grievance challenged a policy or procedure of the Department.  Additionally, the Department asserts the ALC erred in finding the doctrine of equitable tolling applied to Torrence's claims because the Department "did nothing whatsoever to hinder Torrence's discovery of his wage claims or his ability to pursue his claims."  We disagree.

"[The Department's] Inmate Grievance System Policy, designated as Policy GA-01.12, provides for formal review of inmate complaints in two steps." *Ackerman v. S.C. Dep't of Corr.*, 415 S.C. 412, 414, 782 S.E.2d 757, 758 (Ct. App. 2016).  "Paragraph 13.1 of Policy GA-01.12 requires an inmate to file a [s]tep [one] Inmate Grievance Form within fifteen days of the alleged 'incident.'" *Id.* at 418, 782 S.E.2d at 760.  "Policy GA-01.12 does not define the term 'incident,' but [P]aragraph 13.9 provides . . . [e]xceptions to the [fifteen-]day time limit requirement *will* be made for grievances concerning *policies/procedures*." *Id.* (quoting Paragraph 13.9, Policy GA-01.12).

Although the Department does not define "policies and procedures" in its policy, it provided this court with the following definition in *Ackerman*:

> [T]he terms "policies" and "procedures" constitute
> approved guidelines for handling the [Department's]

day-to-day operations as well as statements expressing the basic expectations of conduct for agency staff and inmates. More formally stated, the terms "policies" and "procedures" constitute agency directives deemed by the responsible agency officials as "necessary to preserve internal order and discipline, and to maintain institutional security in prison."

*Id.* at 419, 782 S.E.2d at 761 (first alteration by court).  Because the Department operates PIP as a part of its day-to-day operations, this court found that an inmate grievance challenging a specific pay rate and invoking the Prevailing Wage Statute[7] constitutes a grievance challenging a policy or procedure under Paragraph 13.9, rather than a grievance involving a specific incident under Paragraph 13.1. *Id.* at 418-20, 782 S.E.2d at 760-61.  Additionally, this court found grievances invoking the Prevailing Wage Statute involve "a topic governed by statute and, thus, an expression of the legislature's policy on inmate pay."  *Id.* at 420, 782 S.E.2d at 761.  The court explained,

As [the Department] is mandated to carry out these legislative policies, [the Department], in turn, expresses its own, more specific policies regarding pay rates and other working conditions for inmates in its contracts with [PIP] sponsors. . . .

Moreover, the provisions of these contracts are *enduring and have the same effect on numerous inmates*. Therefore, they cannot realistically be characterized as "incidents," which are temporally limited and rarely affect more than a few inmates.

*Id.* at 420-21, 782 S.E.2d at 762 (emphasis added).  Accordingly, this court held these types of grievances are exempt from the fifteen-day deadline enumerated in Paragraph 13.1 and the Department's "attempt to characterize [inmate] wage

---

[7] S.C. Code Ann. § 24-3-430(D) (2007).

grievances as incident grievances was arbitrary and capricious." *Id.* at 421, 782 S.E.2d at 762.

In the instant case, we find Torrence timely filed his step one grievance. As in *Ackerman*, Torrence's claims involved "topic[s] governed by statute" that reflect the Department's "expression of the legislature's policy on inmate pay." 415 S.C. at 420-21, 782 S.E.2d at 761-62 (finding inmate grievances raising topics governed by statute that involve enduring conditions, such as inmate wages, "cannot realistically be characterized as 'incidents,' which are temporally limited and rarely affect more than a few inmates"). Specifically, Torrence alleged the Department failed to pay him the prevailing wage for his labor under PIP and erroneously prevented him from designating "persons or entities" to receive immediate distributions of his escrowed wages. Because Torrence's claims involve continuous conditions potentially affecting numerous inmates, we find Torrence's grievance involves Department policies and procedures, rather than an isolated incident. Therefore, we find Torrence's grievance falls within the exception enumerated in Paragraph 13.9 of the Department's Policy GA-01.12, and thus, Paragraph 13.1's fifteen-day filing rule does not apply. *See id.* at 421, 782 S.E.2d at 762 (holding the Department's attempt to characterize inmate wage grievances as "incident" grievances under Paragraph 13.1 was arbitrary and capricious). Accordingly, we affirm the ALC's finding that Torrence timely filed his step one grievance.

Because our finding on this issue is dispositive as to the timeliness of Torrence's grievance, we need not address whether the ALC erred in applying the doctrine of equitable tolling. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding an appellate court need not address remaining issues when disposition of a prior issue is dispositive).

## II.    CALCULATION OF THE PREVAILING WAGE

The Department argues the ALC erred by calculating the prevailing wage for Torrence's labor performed through PIP because it "misapprehended the applicable state law, federal law, and federal regulations." Specifically, the Department

asserts section 24-3-410(B)(7)[8] is the controlling authority over inmate wages received through PIP, rather than section 24-3-430(D). Arguing the ALC erroneously ignored the analysis of the circuit court in *Adkins*, the Department urges this court to adopt the circuit court's holding, which found pursuant to section 24-3-410(B)(7), inmates were only entitled to a comparable wage in the industry and not the prevailing wage. The Department therefore asserts the wage Torrence received complied with South Carolina law because it was ten cents over the federal minimum wage for similar labor. The Department further argues the ALC erred in its calculation of the prevailing wage because the record did not contain sufficient evidence to support the calculation. We disagree.

Preliminarily, we find the Department's assertion that section 24-3-410(B)(7) preemptively governs inmate wages earned through PIP is a misinterpretation of the law. Section 24-3-410 provides:

> (A) It is unlawful to sell or offer for sale on the open market . . . articles or products manufactured or produced wholly or in part by inmates . . . .
>
> (B) The provisions of this section do not apply to: . . .
>
> > (7) products . . . produced by inmates of the Department . . . employed in [PIP] if the inmate workers participate voluntarily, *receive comparable wages*, and the work does not displace employed workers.

S.C. Code Ann. § 24-3-410(A), (B)(7) (2007) (emphasis added). Section 24-3-430(D) provides, "No inmate participating in the program may earn *less than*

---

[8] S.C. Code Ann. § 24-3-410(B)(7) (2007) (stating the prohibition on selling prison made products on the open market does not apply to "products . . . produced by inmates of the Department . . . employed in [PIP] if the inmate workers . . . *receive comparable wages*, and the work does not displace employed workers" (emphasis added)).

*the prevailing wage* for work of [a] similar nature in the private sector." S.C. Code Ann. § 24-3-430(D) (2007) (emphasis added). Although both statutes refer to inmate wages earned through PIP, we find section 24-3-430(D) is the controlling authority, as it directly addresses the rate of inmate wages. *See Bruning v. S.C. Dep't of Health and Env't Control*, 418 S.C. 537, 545, 795 S.E.2d 290, 294 (Ct. App. 2016) ("Generally, '[a] specific statutory provision prevails over a more general one.'" (quoting *Wooten ex rel. Wooten v. S.C. Dep't of Transp.*, 333 S.C. 464, 468, 511 S.E.2d 355, 357 (1999))). Further, as stated in the ALC's order, our precedent has primarily addressed inmate wage claims within the context of section 24-3-430(D). *See S.C. Dep't of Corr. v. Cartrette*, 387 S.C. 640, 646, 694 S.E.2d 18, 21 (Ct. App. 2010) (finding "sections 24-3-315 and 24-3-430(D) compel the Department to ensure inmate workers who are employed under those sections receive the same pay rates and employment conditions as their non-inmate peers"); *Wicker*, 360 S.C. at 425, 602 S.E.2d at 58 (holding "there is simply nothing in the [PIP] statutory scheme authorizing the [Department] to pay Wicker a training wage less than the prevailing wage" as provided by section 24-3-430).

However, we find section 24-3-410 and other sections within Article 3 still bear importance in determining the legislative intent behind the statutes governing PIP. *See Original Blue Ribbon Taxi Corp. v. S.C. Dep't of Motor Vehicles*, 380 S.C. 600, 608, 670 S.E.2d 674, 678 (Ct. App. 2008) ("When statutes address the same subject matter, they are *in pari materia[]* and must be construed together, if possible, to produce a single, harmonious result."). In comparing these sections with our precedent, it is clear the legislature intended to provide inmates with employment opportunities that would not displace workers in the private sector. *See* S.C. Code Ann. § 24-3-315 (2007) ("The director must determine prior to using inmate labor in a [PIP] project that it will not displace employed workers, . . . and that the rates of pay and other conditions of employment are not less than those paid and provided for work of [a] similar nature in the locality in which the work is performed."); S.C. Code Ann. § 24-3-430(E) (2007) ("Inmate participation in [PIP] may not result in the displacement of employed workers in the State of South Carolina and may not impair existing contracts for services."); *see also Cartrette*, 387 S.C. at 646, 694 S.E.2d at 22 (holding "[f]ailure of the Department's contracts with PIP sponsors to provide inmate workers with time-and-a-half pay for overtime hours when their non-inmate counterparts receive it

would create an impermissible and unfair advantage for inmate labor over private labor").  Therefore, we find the legislature created section 24-3-430(D) as a safeguard to prevent inmates from becoming a cheaper alternative to their counterparts in the private realm.  Accordingly, we find the pivotal inquiry in the instant case becomes how the prevailing wage for a particular industry is calculated.

"The issue of interpretation of a statute is a question of law for the court." *Bruning*, 418 S.C. at 544, 795 S.E.2d at 294 (quoting *State v. Sweat*, 379 S.C. 367, 373, 665 S.E.2d 645, 648 (Ct. App. 2008)).  "The cardinal rule of statutory interpretation is to ascertain and effectuate the legislature's intent." *Blue Ribbon Taxi*, 380 S.C. at 607, 670 S.E.2d at 677.  "*Legislative intent must prevail* if it can be reasonably discovered in the language employed and that language must be construed in the light of the intended purpose of the statute." *Id.* at 607, 670 S.E.2d at 678 (emphasis added).  "The plain language of the statute is the principal guidepost in discerning the General Assembly's intent." *Id.*  "Words in the statute should be given their plain and ordinary meaning without [resorting] to forced or subtle construction." *Id.* at 608, 670 S.E.2d at 678.

Because Article 3 fails to define the term "prevailing wage," we must apply its customary meaning.  *See Strother v. Lexington Cnty. Recreation Comm'n*, 332 S.C. 54, 62, 504 S.E.2d 117, 122 (1998) ("When faced with an undefined statutory term, the court must interpret the term in accord with its usual and customary meaning."); *Lee v. Thermal Eng'g Corp.*, 352 S.C. 81, 91-92, 572 S.E.2d 298, 303 (Ct. App. 2002) ("Where a word is not defined in a statute, our appellate courts have looked to the usual dictionary meaning to supply its meaning.").  According to the *Merriam-Webster Dictionary*, "prevailing" means to be frequent or predominant.  It further defines "predominant" as being most frequent or common.  Therefore, based on a plain reading of section 24-3-430(D) and its legislative intent, we agree with the ALC's interpretation that to determine the prevailing wage for an industry, the Department must determine the mean average wage for the occupation at issue using records and data from DEW.  *See Average*, *Black's Law Dictionary* (11th ed. 2019) (defining "average" as "[t]he ordinary or typical level; the norm"); *Average*, *Merriam-Webster Dictionary* (defining "average" as a level typical of a group, class, or series).  Accordingly, we affirm the ALC's

calculation of the prevailing wage for the years 1997 to 1999 and its decision to remand Torrence's grievance to the Department for the calculation of the prevailing wage for the years 2000 to 2004.

## III.    DISTRIBUTION OF ESCROWED WAGES

The Department argues the ALC erred by finding section 24-3-40 of the South Carolina Code allowed Torrence to designate persons or entities to receive immediate distributions of his escrowed wages.  According to the Department, section 24-3-40 is an unambiguous statute and therefore requires a plain reading of its text.  The Department asserts a plain reading of the statute reveals an inmate sentenced to life imprisonment "may only distribute the monies held in escrow for his benefit by operation of § 24-3-40(A)(5) upon his natural death."

Torrence argues section 24-3-40(B)(2) allows him the option of electing either immediate distribution of his escrowed wages to persons and entities of his choosing or the inclusion of the escrowed wages in the distribution of his estate. Torrence therefore asserts the ALC properly harmonized sections 24-3-40(A)(5) and (B)(2) in its construction of the statute.

"Interpreting and applying statutes and regulations administered by an agency is a two-step process." *Kiawah*, 411 S.C. at 32, 766 S.E.2d at 717.  "First, a court must determine whether the language of a statute or regulation directly speaks to the issue.  If so, the court must utilize the clear meaning of the statute or regulation." *Id.*  "Words in the statute should be given their plain and ordinary meaning without [resorting] to forced or subtle construction." *Blue Ribbon Taxi*, 380 S.C. at 608, 670 S.E.2d at 678.  "If the statute or regulation 'is silent or ambiguous with respect to the specific issue,' the court then must give deference to the agency's interpretation of the statute or regulation, assuming the interpretation is worthy of deference." *Kiawah*, 411 S.C. at 33, 766 S.E.2d at 717 (quoting *Chevron,* 467 U.S. at 843).

Section 24-3-40 provides:

(A) Unless otherwise provided by law, the employer of a prisoner authorized to work . . . [under PIP] . . . shall pay the prisoner's wages directly to the Department . . . . The Director of the Department . . . shall deduct the following amounts from the gross wages of the prisoner: . . .

> (5) Ten percent must be held in an interest bearing escrow account *for the benefit of the prisoner*.

> . . . .

> (B) The Department . . . shall return a prisoner's wages held in escrow pursuant to subsection (A) as follows: . . .

> > (2) A prisoner serving life in prison . . . *shall be given the option* of having his escrowed wages included in his estate *or* distributed to the persons or entities of his choice.

S.C. Code Ann. § 24-3-40(A)(5), (B)(2) (Supp. 2020) (emphases added).

We construe subsections (A)(5) and (B)(2) to allow for *either* immediate distribution of an inmate's escrowed wages to persons or entities of his choosing *or* inclusion of these assets in the distribution of his estate. *See Anderson v. S.C. Election Comm'n*, 397 S.C. 551, 556, 725 S.E.2d 704, 707 (2012) ("In construing statutory language, the statute must be read as a whole, and sections which are a part of the same general statutory law must be construed together and each one given effect."). Subsection (B)(2) states an inmate serving a life sentence *shall be given the option* to include his withheld wages in his estate *or* to distribute them to persons or entities of his choosing. Further, subsection (A)(5) provides these wages will be held in an escrow account *for the benefit of the prisoner*. Because an inmate serving a life sentence will never receive the benefit of his wages outside of prison unlike those who will be released during their lifetime, we find the Department's interpretation of section 24-3-40 arbitrary and capricious. Accordingly, we affirm the ALC's construction of section 24-3-40 and find the

Department erred by refusing Torrence the option of designating persons or entities for immediate distribution of his escrowed wages.

**CONCLUSION**

Accordingly, the decision of the ALC is

**AFFIRMED.**

**GEATHERS and MCDONALD, JJ., concur.**